IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SAGRARIO DIAZ and FLORENCIA VALENCIA, | |
| Plaintiffs, | ORDER |
| | AND |
| | MEMORANDUM DECISION |
| vs. | |
| | |
| GRAPHIC PACKAGING INTERNATIONAL, INC. aka ALTIVITY PACKAGING, | Case No. 2:13-cv-00238-TC |
| Defendants. | |

Plaintiffs Sagrario Diaz and Florencia Valencia are former employees of Defendant

Graphic Packaging International, Inc. (GPI),[1] a company that makes paperboard packaging for

consumer goods. Plaintiffs both worked as inspectors at GPI's Salt Lake City plant, meaning they

inspected bags for quality and prepared the approved bags for shipping. Ms. Valencia was

employed at the Salt Lake City plant from August 27, 1997, to February 11, 2011. Ms. Diaz was

employed at the plant from April 29, 2002, to October 5, 2009. Both Plaintiffs were injured while

working at GPI, and both filed for workers' compensation benefits. When GPI terminated both

Plaintiffs, they filed the complaint in this case, claiming that GPI wrongfully discharged them in

retaliation for exercising their rights under Utah's Workers' Compensation Act.

_____

[1] Altivity Packaging (Altivity) previously owned GPI's Salt Lake City plant. In 2008, GPI and its parent company acquired Altivity, merged Altivity's assets with GPI's, and dissolved Altivity. Although Plaintiffs named Altivity as a defendant in this case, Altivity no longer exists and has not been served with the complaint.

GPI has filed a Motion for Summary Judgment, asserting that Plaintiffs cannot make out a prima facie case of retaliatory discharge. GPI also argues that, even if Plaintiffs can establish a prima facie case, they cannot show that GPI's reasons for discharge were a pretext for the alleged retaliation. The court finds that GPI is entitled to summary judgment on Plaintiff Florencia Valencia's claims. Ms. Valencia has not demonstrated a causal connection between her filing of a workers' compensation claim and her discharge. As such, she cannot make out a prima facie case of wrongful discharge. But Plaintiff Sagrario Diaz has met her burden to establish a prima facie case and has also shown that a factual dispute exists on the issue of pretext. Accordingly, GPI's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

GPI also filed a Motion to Sever, requesting a separate trial for each Plaintiff's claims. In response to GPI's motions, Plaintiffs filed a Verified Rule 56(d) Motion to Deny Defendant's Motion for Summary Judgment. GPI's Motion to Sever and Plaintiffs' Rule 56(d) Motion are DENIED AS MOOT.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

As GPI inspectors, Plaintiffs' employment with GPI was governed by a Labor Agreement (Dkt. No. 81-2) between GPI and the Teamsters District Council No. 2, Local 541-S (the Union). For Ms. Valencia's claims, two provisions of the Labor Agreement are relevant. First, Section 10, Paragraph C says, "Seniority shall terminate and be lost when an employee is on layoff or off

---

[2] The facts are taken from the parties' pleadings and briefing on GPI's motion for summary judgment, with the court identifying disputes of material fact where they may exist. Because Ms. Diaz and Ms. Valencia are the nonmoving parties, the court lays out the facts and all reasonable inferences from those facts in the light most favorable to them. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

2

work for any reason longer than twelve (12) consecutive months without approval of the Union

and the Company." (Id. at 6.)  And Section 24, Paragraph C explains medical leaves of absence:

> Medical Leaves: Following one (1) year of continuous employment, an employee may be granted an unpaid medical leave of absence without loss of seniority for up to 12 months upon presentation of medical documentation from a physician supporting such request. The Company may require a medical examination (at Company expense) by a physician of its choice as a condition of granting such medical leave.

(Id. at 16.)  To contest Ms. Diaz's claims, GPI points to Section 11 of the Labor Agreement,

which reads, "The Company has the right to discharge any employee for cause or violation of

house rules . . . ." (Id. at 8.) GPI's house rules list several "causes for discipline or discharge,"

including "[d]ishonesty in maintaining Company records."  (Plant Rules at 1, Dkt. No. 64-4.)

  According to GPI, the plant has a cyclical workload based on seasonal needs. Orders for

bags holding construction and mining materials decrease when the work in these industries slows

in the fall. When its workload lessens, GPI temporarily furloughs employees in the affected

departments based on seniority.[3] If and when business increases, GPI recalls employees based on

seniority, with those with the most seniority returning to work first. But when employees are

furloughed for more than forty-five days without being recalled, GPI assesses whether workload

will increase enough to bring employees back to work in the immediate future. If business is not

---

[3] GPI states that furloughs happen each year. (Def.'s Mot. for Summ. J. and Mem. in Supp. at p. 4, ¶ 11, Dkt. No. 63.) Plaintiffs deny this statement, based on Ms. Valencia's declaration testimony that she recalls only three or four years in which GPI had a slow season resulting in furloughs. (Dkt. No. 81-7 at p. 3, ¶ 4.)  Even accepting Plaintiffs' version of these facts, Plaintiffs do not dispute that GPI's business slowed during 2009 and 2010, which resulted in the furloughs leading up to Ms. Valencia's discharge.

expected to grow sufficiently, employees who have been furloughed for more than forty-five days are discharged based on seniority and those with the least seniority are laid off first.

## I.    Florencia Valencia

Florencia Valencia began working at GPI's Salt Lake City plant on August 27, 1997. While working at GPI, Ms. Valencia filed two workers' compensation claims.  Ms. Valencia's first claim was for a left shoulder injury, which occurred on January 8, 2007.  Ms. Valencia filed her claim in October 2007 and was off work due to her injury from February 2008 to March 7, 2009.[4]  A meeting was held with Ms. Valencia on August 9, 2009, in which her seniority was reset based on her absence from work for longer than twelve consecutive months.

On August 10, 2009, Ms. Valencia injured her right shoulder at work. Ms. Valencia filed a second workers' compensation claim for this injury and was off work from August 20 to August 28, 2009. When Ms. Valencia returned on August 28, she learned that she and several other employees had been furloughed.  Ms. Valencia was recalled to work on October 5, 2009, but was unable to work the full day because of pain in her right shoulder. Ms. Valencia missed work from sometime in October or November 2009 through September or October 2010.[5]

---

[4] GPI's shop steward, Robert Herrera, testified that he thought Ms. Valencia had come to work for a day or two during this time, but he could not say with certainty whether Ms. Valencia returned for any period of time.  Ms. Valencia, on the other hand, specifically testified that she was off work from February 2008 to March 2009. (Dkt. No. 93-4 at 58:18-24.)  Even viewing the evidence in the light most favorable to Ms. Valencia, the court concludes that Ms. Valencia did not work from February 2008 to March 2009.

[5] According to GPI, Ms. Valencia returned to work on October 5, 2009, but had to miss work due to her right shoulder injury from October 6, 2009, through mid-October 2010. Ms. Valencia maintains she was off work from sometime in November 2009 to September 14, 2010.

On September 14, 2010, Ms. Valencia's doctor, Dr. Dean Walker, released Ms. Valencia to work with no restrictions. Ms. Valencia reported the release to GPI, but GPI required its own fitness-for-duty exam before allowing Ms. Valencia to return to work. On October 15, 2010, Ms. Valencia saw Dr. Mark Anderson at GPI's Work Care Clinic.  During her exam, Ms. Valencia acknowledged that her job involved some overhead work and she could not lift her right arm over her head. Based on his visit with Ms. Valencia, Dr. Anderson reported that overhead work was a job requirement that would have to be accommodated. On October 26, 2010, Dr. Walker saw Ms. Valencia for a second exam and this time agreed with Dr. Anderson's assessment and deferred to Dr. Anderson to decide when Ms. Valencia could begin working again.

In October 2010, while in the process of seeing Dr. Anderson and Dr. Walker, Ms. Valencia and other GPI employees were furloughed when work slowed at the Salt Lake City plant. The furlough lasted over forty-five days and continued for multiple months. By February 2011, GPI did not foresee the necessary workload increase that would allow employees to be recalled in Ms. Valencia's department. As a result, on February 11, 2011, GPI discharged Ms. Valencia, along with other furloughed employees.

## II.    Sagrario Diaz

Sagrario Diaz began working for GPI on April 29, 2002.  On July 22, 2006, Ms. Diaz injured her lower back in a workplace accident.[6]  Ms. Diaz completed an injury report on July 25, 2006.  She continued working for several days but had ongoing pain and was only able to work a

---

[6] The details of Ms. Diaz's injury, including her subsequent medical care, are taken from the Findings of Fact, Conclusions of Law and Order, (Diaz Dep. at Ex. 12, p. SD-000014 to SD000024, Dkt. No. 64-8), prepared by an administrative law judge in connection with Ms. Diaz's September 24, 2009 hearing before the Utah Labor Commission.

few hours each day.  Ms. Diaz asked to see a doctor, but her supervisor refused to refer Ms. Diaz

for medical care.  Ms. Diaz later obtained a referral after asking a different staff member.

On August 7, 2006, Ms. Diaz was seen at the Work Care Clinic for her lower back injury.

Ms. Diaz was diagnosed with a lumbar strain and was released to light duty work. On October 3,

2006, Ms. Diaz began seeing Dr. Junius Clawson. Ms. Diaz reported to Dr. Clawson that she had

injured her back before—on April 12, 2001, in an accident at her former workplace. At the time

of her 2001 injury, Ms. Diaz saw Dr. Bart Fotheringham, who diagnosed a lumbar strain. After

Ms. Diaz reported this history to Dr. Clawson at her October 2006 visit, Dr. Clawson diagnosed a

disc herniation and probable chemical radiculopathy. Ms. Diaz underwent physical therapy and

chiropractic treatment and was released to light duty work. GPI paid workers' compensation

benefits for Ms. Diaz's injury from about August 14 to October 18, 2006.

Ms. Diaz was later released to full duty in December 2006, but her back pain increased.

For the next several months, Ms. Diaz saw various providers, received medical care for her injury

and was subject to work restrictions, which GPI accommodated.  For example, in January 2007,

Ms. Diaz received injections for her back pain and was released to sedentary work duty. On

February 28, 2007, Ms. Diaz was released from work for a four-week conditioning program,

which significantly reduced her back pain. With her improved condition, Ms. Diaz was given

permanent light duty work restrictions. At this time, Dr. Clawson did not believe Ms. Diaz was a

candidate for surgery. But in November 2007, Ms. Diaz's back pain increased, medication did

not relieve the pain, and Ms. Diaz suffered pain through February 2008.

On April 2, 2008, Dr. Clawson opined that Ms. Diaz's condition was medically caused by

the July 22, 2006 accident and released Ms. Diaz from work. Despite her earlier back injury in

6

2001, Dr. Clawson did not believe Ms. Diaz suffered from a preexisting condition that

contributed to her symptoms. On May 28, 2008, Dr. Clawson recommended surgery for Ms.

Diaz's injury.

On July 3, 2008, GPI's workers' compensation carrier denied coverage for Ms. Diaz's

surgery, stating that her injury did not occur within the scope of her employment. In September

2008, Ms. Diaz requested a hearing with the Utah Labor Commission, asking for an order

requiring coverage for her injury and the related treatment, including surgery.

Before Ms. Diaz had her hearing before the Labor Commission, she continued to seek

treatment for her lower back injury. On July 23, 2008, Ms. Diaz saw Dr. Armen Khachatryan.

Like Dr. Clawson, Dr. Khachatryan also recommended surgery, and on August 11, 2008, the

surgery was performed.  Ms. Diaz remained on leave from work following the surgery. On

February 17, 2009, Dr. Khachatryan released Ms. Diaz to return to work with a lift restriction of

less than fifty pounds. GPI could not accommodate this restriction. Ms. Diaz saw Dr.

Khachatryan again on June 11, 2009, and he released Ms. Diaz to return to work with no

restrictions.  Ms. Diaz returned to work sometime in June or July of 2009. On August 9, 2009,

Ms. Diaz learned that her seniority was being reset based on her absence from work for more

than twelve consecutive months.

On September 24, 2009, Ms. Diaz had a hearing before the Labor Commission. Ms.

Diaz's medical records from a February 14, 2002 visit with Dr. Fotheringham were presented at

the hearing.  The records showed that Dr. Fotheringham had noted work restrictions which

limited Ms. Diaz to frequent lifting at twenty-five pounds, maximum lifting of fifty pounds, and

standing for one and a half hours at a time, or three hours total. On October 5, 2009, GPI

discharged Ms. Diaz, citing its house rule that prohibited falsification of company records. GPI claimed that Ms. Diaz had violated this rule by failing to identify Dr. Fotheringham's work restrictions on her health history form.

Ms. Diaz had completed the health history form on April 26, 2002, during a pre-employment physical exam performed at the Work Care Clinic. As part of the exam, Ms. Diaz completed and signed the form, indicating that she did not have any impairment that would restrict physical work. Ms. Diaz then began working at the Salt Lake City plant on April 29, 2002. Although Ms. Diaz did not report Dr. Fotheringham's restrictions on her health history form, she now explains that Dr. Fotheringham's report was requested by and addressed to the Workers' Compensation Fund of Utah, not to Ms. Diaz.  In addition, in the comments section of the health history form, Ms. Diaz did state that she had injured her back in 2001, that she had received disability or workers' compensation benefits, but that the injury was resolved.

## ANALYSIS

GPI now seeks summary judgment on Plaintiffs' claims that they were wrongfully discharged in retaliation for exercising their rights to workers' compensation benefits. The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), but it "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." N. Natural Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626, 629 (10th Cir. 2008).

When analyzing retaliatory discharge claims at the summary judgment stage, the court applies the burden-shifting analysis that the Supreme Court announced in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 804-05 (1973).[7]  Under McDonnell Douglas, "a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (citations omitted). Once a plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory justification for the discharge."  Foster v. Alliedsignal Inc., 293 F.3d 1187, 1193 (10th Cir. 2002). "Once the defendant meets its burden of production by offering a legitimate rationale in support of its employment decision, the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for [retaliation]."  Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994) (citing McDonnell Douglas, 411 U.S. at 804-05).

## I.       Prima Facie Case

To make out a prima facie case of retaliatory discharge, "an employee must show: "(i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's brought the policy into play; and (iv) that the discharge and the conduct bringing the conduct into play are causally connected."  Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 404 (Utah 1998).  For purposes of this motion, GPI concedes that Ms. Diaz and Ms. Valencia can establish the first three elements of their respective prima facie cases.[8] (Def.'s Mot. for Summ. J.

---

[7] The McDonnell Douglas framework applies only on summary judgment, not at trial. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) ("[T]he three-part McDonnell Douglas burden-shifting analysis is limited to the summary judgment context.").

[8] The court agrees. First, there is no dispute that GPI discharged both Ms. Diaz and Ms. Valencia.  In addition, although Utah law generally "presumes that an employment arrangement that does not have a specific term of duration is at-will," Ryan, 972 P.2d at 400, Utah courts have specifically held "that retaliatory discharge for filing a workers' compensation claim violates the public policy of this state; thus, an employee who has been fired or constructively discharged in

and Mem. in Supp. at 16, Dkt. No. 63.) With only the final element in dispute, the question is whether Ms. Diaz and Ms. Valencia can each prove that their terminations were causally connected to their pursuit of workers' compensation benefits.

To establish a causal connection, Plaintiffs must show evidence of an "unlawful intent on the part of the employer to terminate the employee because the employee has filed a statutory claim, or has been injured and may file such a claim." Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1116 (10th Cir. 2001). Plaintiffs can meet this burden by "proffer[ing] 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007) (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006)). The close proximity requirement must not be "unduly stretched," but at the same time, "the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the [claim] and only culminates later in actual discharge." Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996).

### A. Causal Connection – Ms. Valencia

To establish causal connection, Ms. Valencia argues that the court should look at the reset of her seniority as the initial retaliatory act that began the process culminating in her discharge. Even if the court uses Ms. Valencia's loss of seniority as a starting point, there is not a close

---

retaliation for claiming workers' compensation benefits has a wrongful discharge cause of action." Touchard v. La-Z-Boy Inc., 2006 UT 71, ¶ 1, 148 P.3d 945. Finally, by filing workers' compensation claims, Plaintiffs both attempted to exercise their statutory rights to benefits, which brought the public policy into play. See Ryan, 972 P.2d at 408 (citing Lally v. Copygraphics, 428 A.2d 1317 (N.J. 1981)).

temporal proximity between this event and the filing of Ms. Valencia's workers' compensation claim. The evidence instead shows that Ms. Valencia injured her left shoulder on January 8, 2007, while working as an inspector at GPI's Salt Lake City plant. About nine months later, Ms. Valencia filed a claim for workers' compensation benefits for her injury. After filing her claim, Ms. Valencia continued to work for about four months before taking leave beginning in February 2008. And during the time Ms. Valencia did not work due to her injury, GPI retained her as an employee. GPI then allowed Ms. Valencia to return to work over a year later, in March 2009. Ms. Valencia kept her seniority for about five months after returning to work.  But on August 9, 2009, GPI and/or the Union met with Ms. Valencia and explained that her seniority was being reset based on her absence from work for longer than twelve consecutive months.

Ms. Valencia lost her seniority nearly two years after she filed her workers' compensation claim.  And Ms. Valencia was not discharged until February 2011, about a year and a half after she lost her seniority. With this significant time lapse, the court cannot presume a causal connection between Ms. Valencia's workers' compensation claim and her discharge, particularly in light of case law holding that much shorter periods were insufficient for the court to infer causation. See, e.g., Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) ("[T]he four month time lag between [plaintiff's] participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation."); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) ("[T]he three-month period between the activity and termination, standing alone, does not establish a causal connection.").

Moreover, Ms. Valencia has not identified other evidence that GPI had "unlawful intent" to retaliate against Ms. Valencia because she filed a statutory claim. The evidence instead shows

that the decision about Ms. Valencia's seniority was based on company policy. The parties

dispute who was responsible for making seniority decisions—GPI maintains it simply

implements seniority determinations made by the Union, while Ms. Valencia contends that GPI

also has authority to independently make seniority decisions.  But the dispute is not material.

Section 10, Paragraph C of the Labor Agreement mandates the loss of seniority when an

employee is off work longer than twelve consecutive months for any reason, unless the Union

and GPI approve extended leave.  (Labor Agreement at 6, Dkt. No. 81-2.)  Although Section 24

of the Labor Agreement provides for medical leaves of absence, it specifically states that "an

employee may be granted an unpaid medical leave of absence without loss of seniority for up to

12 months."  (Id. at 16 (emphasis added).)

Under these provisions, Ms. Valencia was entitled to take work off for her left shoulder

injury, but when her leave lasted longer than twelve months, Ms. Valencia needed approval for

the additional time.  There is no evidence that Ms. Valencia requested extended leave for her

injury or that GPI and the Union approved her leave beyond twelve months. Without approval

from both GPI and the Union, Ms. Valencia ran the risk of losing her seniority when she did not

return to work before the twelve-month cutoff.  Ms. Valencia testified that she assumed she

could stay on leave because her injury was work-related, (Valencia Dep. 112:7-19, Dkt. No. 92-

4), but she has not identified a company policy or any other evidence that would justify her

assumption.  Regardless of which entity decided to reset Ms. Valencia's seniority, the decision

was consistent with the terms of the Labor Agreement.

Ms. Valencia also relies on statements by GPI's human resources manager, Steve

Wennergren, that "everything" would be the same when she returned from leave. The evidence,

however, does not show that Mr. Wennergren approved Ms. Valencia's leave to allow her to retain her seniority. In her deposition, Ms. Valencia testified that when she came back to work in March 2009, she was moved to a new machine, so she expressed concerns about the change. In response, Mr. Wennergren said "that nothing was going to change, that everything was going to be the same; [her] pay and everything, it was going to be the same." Ms. Valencia did not testify that Mr. Wennergren promised that her seniority would remain intact despite her extended leave. Her testimony related solely to her concern about being moved to a new machine. (Id.)

In addition, Mr. Wennergren testified that when Ms. Valencia returned to work, he made an "initial decision" to reassign her to a new position and shift based on her original seniority. (Wennergren Dep. 36:10-14, Dkt. No. 64-6.)  But the chief shop steward, Robert Herrera, relayed complaints from other employees who believed the Labor Agreement would be violated if Ms. Valencia retained her seniority. After considering the situation, Ms. Valencia's seniority was reset. (Id. at 36:14-37:24.) Neither Ms. Valencia nor the Union completed the grievance process to challenge this decision.[9]

Even when viewed in the light most favorable to Ms. Valencia, this evidence merely shows that after Ms. Valencia took leave for her left shoulder injury, GPI allowed her to return to work and initially planned to maintain Ms. Valencia's seniority. But because she had been off work for longer than twelve months and had not obtained approval for her extra leave, GPI reset

---

[9] The Labor Agreement outlines a four-step grievance procedure. Although Mr. Herrera testified that he conveyed a grievance for Plaintiffs' loss of seniority, neither party has submitted documents or other evidence showing that a grievance was formally filed or that it proceeded through the steps required by the Labor Agreement. The Union produced records of grievances filed for other employees, but the documents did not include records of a grievance for Ms. Valencia.

Ms. Valencia's seniority, as required by the Labor Agreement. The court cannot infer from this evidence that GPI intended to retaliate against Ms. Valencia because she filed a workers' compensation claim, nor can it see a "pattern of retaliatory conduct begin[ning] soon after the filing of the [claim] and only culiman[ing] later in actual discharge." Marx, 76 F.3d at 329.

Similarly, the events after Ms. Valencia's loss of seniority, including the events surrounding Ms. Valencia's second workers' compensation claim, do not support an inference of retaliatory motive. First, there is no temporal proximity between Ms. Valencia's second claim and her eventual discharge. On August 10, 2009, the day after she lost her seniority, Ms. Valencia had a second workplace injury, this time to her right shoulder. Ms. Valencia filed a separate workers' compensation claim and was off work from August 20 to August 28, 2009. But Ms. Valencia was not discharged until February 11, 2011. This gap of about a year and a half "does not support an inference of retaliatory motive." Proctor, 502 F.3d at 1209.

And there is no other evidence from which the court can infer a causal connection between either of Ms. Valencia's workers' compensation claims and her discharge. When Ms. Valencia returned to work after her second injury, GPI had initiated seasonal furloughs, and Ms. Valencia was furloughed as part of that process. Even during the furlough, however, GPI recalled Ms. Valencia to work. On October 5, 2009, Ms. Valencia came to work but was unable to stay due to pain in her right shoulder. Ms. Valencia then left work from October or November 2009 through September or October 2010.[10]

---

[10] While the parties dispute the beginning and ending dates of Ms. Valencia's second leave, the difference is not material because Ms. Valencia had already lost her seniority based on her earlier absence from February 2008 through March 2009.

14

On September 14, 2010, Ms. Valencia's doctor gave approval for her to return to work, but GPI required its own fitness-for-duty exam. Ms. Valencia's exam showed that she could not perform overhead work, so an accommodation would have to be made. Ms. Valencia's own doctor later agreed with this assessment.

While Ms. Diaz was in the process of having her fitness-for-duty exams, GPI recruited employees for various positions at the Salt Lake City plant. To further support her argument that GPI retaliated against her, Ms. Valencia argues that she could have filled one of these positions if GPI would have approved her return to work. The court disagrees that the evidence relating to other positions supports an inference of retaliation. First, GPI advertised openings for "pouching" positions, but these were temporary positions, providing only one or two weeks of work. If Ms. Valencia had been offered a pouching job, she would have been off work again a short time later. In addition to the pouching positions, GPI recruited for permanent positions, but Ms. Valencia was not qualified to fill most of the openings.  (See Third Aff. Of Steven Wennergren, ¶ 13, Dkt. No. 135-6.)

GPI also hired three new inspectors while Ms. Valencia waited for her Work Care Clinic evaluation. But the evidence shows that, even if GPI had allowed Ms. Valencia to return to work as an inspector in September 2010, she would have been subject to the same furloughs that led to her eventual discharge. Of the three newly hired inspectors, one quit four days after being hired; the other two were subject to the October 2010 furloughs, which were based on lack of work at the Salt Lake City plant.  Ms. Valencia was cleared to return to work with restrictions by October 15, 2010, but she was subject to the same furlough as the two new inspectors. The furlough lasted over forty-five days and continued for many months.  By February 2011, GPI did not

foresee the necessary work increase that would allow employees to be recalled in Ms. Valencia's department. As a result, on February 11, 2011, GPI discharged Ms. Valencia, along with the other two inspectors it had hired.  Even though GPI would not allow Ms. Valencia to resume work until she had a fitness-for-duty exam, and even though GPI decided to hire new employees in the interim, these decisions had no effect on Ms. Valencia's discharge. If she had returned to work a month earlier in September 2010, Ms. Valencia would have been subject to the same furlough and would have been discharged in the same way.

Finally, Ms. Valencia argues that GPI has exhibited a pattern of retaliation against injured employees. To support this argument, Ms. Valencia first points to statements by Dale Bowman, who allegedly said he did not want injured workers assigned to a particular machine. Even assuming Mr. Bowman made disparaging remarks about injured workers, Ms. Valencia testified that Mr. Bowman made the statements in April 2009, almost two years before Ms. Valencia was discharged.  There is no evidence of a connection between his statements and Ms. Valencia's discharge. And there is no evidence that Mr. Bowman had a role in making discharge decisions, including the decision to discharge Ms. Valencia specifically. As a result, the statements cannot support a finding of causation. See Rea, 29 F.3d at 1456-57 (plaintiff failed to demonstrate a connection between her layoff and age discriminatory comments made by a department manager and corporate officer).

Ms. Valencia also relies on deposition testimony from two other GPI employees who are not plaintiffs in this case. While these employees have complaints about GPI, there is no evidence that these employees were similarly situated to Ms. Valencia. The first employee was Kwan Adams, a former GPI employee who filed a workers' compensation claim but did not do

16

so until eighteen months after her termination. Although Ms. Adams was discharged, there is no evidence that GPI fired her for filing a claim. For the second employee, Carol Neromiliotis, there is no evidence that she filed a workers' compensation claim or that she was discharged.  Ms. Neromiliotis is in fact still employed by GPI.  Based on the evidence available, the court concludes that the situations of these other employees differ significantly from and are not relevant to Plaintiffs' claims in this case. See Kendrick, 220 F.3d at 1232 (analyzing treatment of similarly situated employees as relevant on the issue of pretext).

Ms. Valencia has not produced any evidence from which the court may infer that GPI retaliated against her for filing workers' compensation claims. Ms. Valencia was discharged over three years after she filed her first workers' compensation claim, and over a year and half after she filed her second claim. Under the facts of this case, there is no evidence of temporal proximity between Ms. Valencia's efforts to exercise her workers' compensation rights and her discharge. And there is no other evidence suggesting the causal connection necessary to Ms. Valencia's claims.  Ms. Valencia's claims must be dismissed.

### B.      Causal Connection – Ms. Diaz

Plaintiff Sagrario Diaz, on the other hand, has shown a close temporal proximity to establish a causal connection. After working at GPI's Salt Lake City plant for over four years, Ms. Diaz injured her lower back in a workplace accident on July 22, 2006.  About two weeks later, Ms. Diaz saw a doctor and began treatment for her injury.  Ms. Diaz tried multiple types of medical care to address her injury and the corresponding back pain.  The treatment improved her condition for some time, but in November 2007, Ms. Diaz's back pain increased and continued through February 2008.  After an April 2, 2008 exam, Ms. Diaz's doctor, Dr. Clawson, opined

that Ms. Diaz's condition was medically caused by the July 22, 2006 accident. On May 28, 2008, Dr. Clawson recommended surgery. GPI's workers' compensation carrier denied coverage for Ms. Diaz's surgery, contending that her injury did not occur within the scope of her employment.

Ms. Diaz obtained a second opinion, which confirmed the need for surgery, and Ms. Diaz had her surgery in August 2008.  She then applied for a hearing to contest GPI's denial of benefits.  Ms. Diaz's hearing was held before the Labor Commission on September 24, 2009.  On October 5, 2009, GPI terminated Ms. Diaz.

In determining whether causation may be inferred from this timeline of events, it is important to identify Ms. Diaz's protected conduct that forms the basis for her claim. GPI argues that the court should look solely at the actual filing of Ms. Diaz's workers' compensation claim, which occurred on July 25, 2006, when Ms. Diaz completed a formal injury report.  In GPI's view, the only other relevant date is October 5, 2009, the day Ms. Diaz was discharged. According to GPI, the over-three-year gap between these dates cannot show a causal connection.

Ms. Diaz contends that protected conduct should encompass all rights afforded by the Workers' Compensation Act, not just the right to file a claim.  Ms. Diaz relies on Touchard v. La-Z-Boy Inc., 2006 UT 71, 148 P.3d 945, for the proposition that a wrongful discharge cause of action arises when the employee is terminated for exercising any right provided by the Act. While her filing of a claim was protected, Ms. Diaz maintains that the court should look at her subsequent efforts to pursue benefits, including her appeal to the Labor Commission.

Although Utah courts have not dealt with the specific issue of whether a plaintiff claiming retaliatory discharge can rely on pursuit of benefits after the initial filing of a claim, Utah case law does not support the restrictive view urged by GPI.  In Touchard, the Utah

18

Supreme Court decided the certified question of "whether the termination of an employee for the

exercise of rights under the Utah Workers' Compensation Act implicates a clear and substantial

public policy that gives rise to a wrongful termination claim." 2006 UT 71, ¶ 5 (internal

quotations and alterations omitted). After analyzing case law and the text of the Act, the court

concluded,

> We therefore hold that an employee's exercise of workers' compensation rights
> constitutes the "exercise of a legal right" that embodies a clear and substantial public
> policy. An employer who terminates an employee in retaliation for the employee's
> exercise of that right has violated a clear and substantial public policy and may be
> sued for wrongful discharge by the discharged employee.

Id. ¶ 19.  In a recent opinion, Stone v. M & M Welding & Construction, Inc., 2013 UT App 233,

312 P.3d 934, the Utah Court of Appeals analyzed the Touchard holding and concluded that it

should not be limited to the initial filing of a workers' compensation claim.

In Stone, the case "involve[d] a 'pretaliatory' discharge—an employee allege[d] that his

employer discharged him not because he had filed a workers' compensation claim but because he

was about to."  Id. ¶ 1. The court noted that the Supreme Court in Touchard at times referred to

filing a claim but at times spoke more broadly of exercising workers' compensation rights. Id. ¶

9.  The court also looked at the elements for a prima facie case for wrongful discharge and

explained that "[t]he test is broadly worded." Id. ¶¶ 9-10. "While the filing of a workers'

compensation claim is obviously relevant," the court "conclude[d] that the public policy

embodied in the Workers' Compensation Act may be 'brought into play' by conduct short of

actually filing a workers' compensation claim," such as "preparing a claim, notifying the

employer of the intent to file a claim, or discussing the claim with coworkers." Id. ¶ 10.

If an employee's conduct before filing a claim is protected, an employee's attempt to advocate for denied benefits is also protected.  Here, Ms. Diaz first exercised her workers' compensation rights by filing a claim for benefits. But she continued to exercise her statutory rights by applying for and participating in a hearing before the Labor Commission. Indeed, the Workers' Compensation Act specifically recognizes an employee's right to a hearing to "contest an action of the employee's employer or its insurance carrier concerning a compensable industrial accident . . . alleged by the employee."  Utah Code Ann. § 34A-2-801(1)(a).

Looking beyond her initial filing of a claim, Ms. Diaz has shown a close temporal proximity between her discharge and her efforts to exercise her right to workers' compensation benefits. Ms. Diaz injured her lower back in a workplace accident in July 2006. GPI initially paid workers' compensation benefits for Ms. Diaz's injury.  But Ms. Diaz's condition did not improve.  And when her doctor said that her condition was medically caused by the GPI accident and recommended surgery, GPI denied coverage, arguing that Ms. Diaz's injury did not occur within the scope of her employment. Ms. Diaz challenged the denial by exercising her right to apply for hearing with the Labor Commission and by participating in the hearing on September 24, 2009.  Eleven days later, GPI discharged Ms. Diaz. This close temporal proximity justifies an inference of causation. With the other elements uncontested, Ms. Diaz has met her initial burden to make out a prima facie case.

## II.    Legitimate Nondiscriminatory Reason for Termination

Under <u>McDonnell Douglas</u>, "if a prima facie case is established, the employer can rebut it by articulating a 'legitimate nondiscriminatory reason' for the adverse action." <u>Piercy v. Maketa</u>, 480 F.3d 1192, 1198 (10th Cir. 2007) (quoting <u>McGowan v. City of Eufala</u>, 472 F.3d 736, 741

(10th Cir. 2006)). "The [defendant] need not persuade the court that it was actually motivated by the proffered reasons, but satisfies its burden merely by raising a genuine issue of fact as to whether it discriminated against the plaintiff." Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1425 (10th Cir.1993) (internal quotations omitted).

GPI asserts that it fired Ms. Diaz because she violated company rules by failing to honestly complete forms when she was hired. GPI points to the fact that at the September 24, 2009 Labor Commission hearing, medical records were presented from Ms. Diaz's February 14, 2002 visit with Dr. Bart Fotheringham.  Dr. Fotheringham saw Ms. Diaz for a back injury that occurred at her previous workplace and imposed work restrictions for Ms. Diaz, particularly for lifting and standing for extended periods of time.  About two months later, Ms. Diaz was offered a position at GPI.  Before she began work, she underwent a pre-employment physical exam at the Work Care Clinic.  As part of her exam, Ms. Diaz completed and signed a health history form, indicating that she did not have an impairment that would restrict physical work.  Ms. Diaz did not identify the work restrictions outlined just two months earlier by Dr. Fotheringham. Ms. Diaz was cleared to work by GPI after her physical and began working at the Salt Lake City plant on April 29, 2002.

Section 11 of the Labor Agreement allows GPI to discharge any employee for violation of house rules. (Labor Agreement at 8, Dkt. No. 81-2.)  And the rules list the "causes for discipline or discharge," including "[d]ishonesty in maintaining Company records." (Plant Rules at 1, Dkt. No. 64-4.)  Because Ms. Diaz did not identify Dr. Fotheringham's work restrictions on her health history form, GPI contends that it discharged Ms. Diaz for a violation of house rules.  On its face, this is a legitimate, nondiscriminatory reason to discharge an employee. The burden now "shifts

back to [Ms. Diaz] to show that the proffered reason actually is a pretext masking discriminatory animus." Piercy, 480 F.3d at 1198.

### III.   Pretext

To raise a fact issue on the question of pretext, the plaintiff must present additional evidence beyond the evidence showing temporal proximity. The plaintiff "must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive." Brown v. ScriptPro, LLC, 700 F.3d 1222, 1230 (10th Cir. 2012) (internal quotations omitted). The plaintiff, however, "need not affirmatively demonstrate that retaliatory reasons motivated [the employer's] decision." Bausman, 252 F.3d at 1120.  The court must give the plaintiff "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision," a burden which can be met "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Tex. Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); see also Morgan, 108 F.3d at 1323 (pretext may be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence" (internal quotations omitted)).

The court must "look at the facts as they appear to the person making the decision to terminate plaintiff." Kendrick, 220 F.3d at 1231; see also Green v. New Mexico, 420 F.3d 1189, 1191 n.2 (10th Cir. 2005) ("[A] challenge of pretext requires a court to look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee.").  "'The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct,' but

22

rather [the court] ask[s] whether [the employer] believed those reasons to be true and 'acted in good faith upon those beliefs." Piercy, 480 F.3d at 1200 (quoting Rivera v. City & County of Denver, 365 F.3d 912, 924-25 (10th Cir. 2004)).  From this view, "[e]ven a mistaken belief can be a legitimate, non-pretextual reason for an employment decision." Id.

        In Marx v. Schnuck Markets, Inc., 76 F.3d 324 (10th Cir. 1996), the Tenth Circuit decided the issue of pretext on facts similar to those present here. The plaintiff, Mr. Marx, and his wife, both applied to work for the defendant grocery store about nine months after they had married. Because the defendant had a policy of not hiring the spouse of a current employee, Mrs. Marx applied first, using her maiden name on her application.  Mr. Marx applied later, stating he was divorced and omitting any reference to his present wife.  After both Mr. and Mrs. Marx were hired, the couple pretended to begin dating as co-employees and later announced they were engaged.

        As the couple proceeded with their pretense, Mrs. Marx began to believe that the defendant had not paid overtime and reported her belief to the defendant. The defendant terminated Mrs. Marx two weeks later, citing falsifications on her employment application. The couple responded by filing a class action suit for unpaid overtime.  About a month later, the defendant began citing Mr. Marx for performance deficiencies and then demoted him. Mr. Marx filed a second suit against the defendant, alleging violations of the FLSA. Through discovery, the defendant learned about the inaccuracies in Mr. Marx's application and fired Mr. Marx for giving false information. In response, Mr. Marx expanded his FLSA claim to include a retaliatory discharge claim. Mr. Marx argued that after he filed his FLSA claim, the defendant retaliated by disciplining and demoting him, by using discovery in his suit to "dredge up information

23

concerning unrelated wrongdoing," and by terminating him. Id. at 329.  The Tenth Circuit found that the defendant's "pattern of actions . . . preclude[d] summary judgment concerning [its] motivation in demoting [Mr. Marx] and terminating his employment." Id.

As in Marx, the evidence in this case supports Ms. Diaz's argument that GPI's proffered reason for her discharge was a pretext.  Although GPI maintains that Ms. Diaz failed to report work restrictions related to her 2001 work injury, Ms. Diaz has produced evidence that she in fact reported her earlier injury multiple times. On her pre-employment health history form, Ms. Diaz indicated that she had been injured on the job, that she had received disability or workers' compensation payments, that her injury had resolved, and that she did not have any impairment that would restrict physical work. GPI argues that the final statement was false in light of Dr. Fotheringham's restrictions.  But GPI never discussed the restrictions with Ms. Diaz or asked about the apparent discrepancy. GPI also acknowledges that it does not know whether Ms. Diaz received a copy of Dr. Fotheringham's report with the included restrictions because the report was addressed solely to the Workers' Compensation Fund of Utah. (Wennergren Dep. at 61:3-62:1, Dkt. No. 92-3.)  Under these circumstances, a jury could conclude that GPI did not truly know or attempt to verify whether Ms. Diaz had been dishonest in her application.

In addition, after obtaining Ms. Diaz's health history, GPI's doctor completed a full physical exam of Ms. Diaz before she was hired.  This exam is meant to "confirm that the employee has the physical ability to do the job." (Id. 63:20-64:7.)  Based on her physical, Ms. Diaz was cleared to work and was hired by GPI.  Significantly, Ms. Diaz was able to perform her work without incident for over four years. And when she saw a doctor after her July 2006 injury,

Ms. Diaz again reported that she had injured her back in 2001.  Despite the earlier injury, Ms.

Diaz's doctor concluded that her condition was caused by the July 2006 accident at GPI.

In sum, Ms. Diaz reported her 2001 injury both in her pre-hire forms and in her medical

exams right after her 2006 injury. And after Ms. Diaz's 2006 injury, GPI resisted its obligation to

pay workers' compensation benefits. Although it initially approved the claim, when GPI learned

that Ms. Diaz needed surgery, it changed its position and denied coverage. When Ms. Diaz

continued to pursue her claim, GPI defended its denial at the Labor Commission hearing but then

discharged Ms. Diaz less than two weeks later.  Drawing all reasonable inferences in Ms. Diaz's

favor, these facts raise a question about GPI's true motivation in discharging Ms. Diaz.  As a

result, Ms. Diaz has met her burden at this stage, and GPI's motion for summary judgment is

denied as it relates to Ms. Diaz.

### II.      Motion to Sever

Shortly after filing its motion for summary judgment, GPI also filed a Motion to Sever

Parties and Claims (Dkt. No. 65). Because Ms. Valencia's claims have now been dismissed on

summary judgment, severance is not necessary and GPI's Motion to Sever is denied as moot.

### III.     Rule 56(d) Motion

Plaintiffs' Verified Rule 56(d) Motion to Deny Defendant's Motion for Summary

Judgment (Dkt. No. 80) is also denied as moot.  In the Rule 56(d) motion, Ms. Diaz and Ms.

Valencia request denial of GPI's motion for summary judgment, based on an argument that

additional discovery was necessary before the motion for summary judgment could be decided.

Plaintiffs referred to motions for additional time for discovery that at the time were pending

before Magistrate Judge Furse.  Judge Furse has now ruled on the discovery motions that were

25

the subject of Plaintiffs' motion. On March 18, 2014, Judge Furse granted the Plaintiffs' motions for additional time to perform their requested discovery (see Dkt. Nos. 113, 121), which primarily included discovery requests and the depositions of GPI employees. The parties completed discovery and submitted amended briefing on the motion for summary judgment, which included factual material and argument based on the additional discovery. The court has considered the parties' complete briefing, including the amended briefs. Because the court has fully considered the additional discovery requested in Plaintiffs' Rule 56(d) motion, the motion is moot.

## ORDER

For the reasons explained above, the court orders as follows:

1.       GPI's Motion for Summary Judgment (Dkt. No. 63) is GRANTED IN PART AND DENIED IN PART. The motion is granted for Ms. Valencia's claims, which are dismissed with prejudice. The motion is denied for Ms. Diaz's claims.

2.       In light of the court's ruling on the motion for summary judgment, GPI's Motion to Sever Parties and Claims (Dkt. No. 65) is DENIED AS MOOT.

3.       The Plaintiffs' Verified Rule 56(d) Motion to Deny Defendant's Motion for Summary Judgment (Dkt. No. 80) is also DENIED AS MOOT.

DATED this 5th day of November, 2014.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge